688 P.2d 1203

**The STATE of Idaho,
Plaintiff-Respondent,**

v.

**Charles James CRABB,
Defendant-Appellant.**

**Nos. 14278, 14542.**

Court of Appeals of Idaho.

Sept. 27, 1984.

E.R. Frachiseur, Hicks & Frachiseur, Mountain Home, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Steven W. Berenter, Deputy Atty. Gen., for plaintiff-respondent.

SWANSTROM, Judge.

Following a jury trial, Charles James Crabb was found guilty of possession of cocaine, methaqualone and methamphetamine without a valid prescription, I.C. § 37–2732(c)(1). He was sentenced to the Board of Correction for indeterminate terms not to exceed three years for each conviction, the sentences to run concurrently. He appeals from these convictions and sentences. In a separate trial before a magistrate, Crabb also was convicted of the misdemeanor of unlawful possession of marijuana. On appeal to the district court, this conviction was affirmed and Crabb appealed again. Because all of these convictions arose from the same circumstances and one issue is common to all counts, the

appeal in the misdemeanor case was consolidated with the appeal from the three felony convictions.

Three issues are raised in these appeals. First, did the lower courts err in denying Crabb's motions to suppress evidence seized by officers during execution of a search warrant? Second, did the district court err in allowing the state's forensic chemist to give his opinion identifying certain controlled substances using drug identification graphs published by the Drug Enforcement Administration? Third, did the district court err in denying Crabb's motion to acquit based upon the alleged failure of the state to prove Crabb lacked a prescription for the drugs found in his possession? We find no error and therefore affirm.

Douglas Williams, an undercover investigator with the Idaho Bureau of Narcotics and Drug Enforcement, gave testimony to a magistrate for probable cause for a search warrant encompassing the following facts. On November 26, 1979, at Boise, Idaho, he received a telephone call from Robert Shook, of Mountain Home, Idaho, who offered to sell him one ounce of cocaine. Upon inquiry, Williams learned that only one ounce was available because Shook's "source" wanted to retain the remainder of the cocaine for sale at a later date. The source, Williams was told, had additional cocaine "grammed up" at his house. Shook also indicated he had not yet obtained the one ounce from his source. Williams arranged to meet Shook at a truck stop between Boise and Mountain Home, and Shook indicated that he would bring his source to that meeting.

In support of Williams' testimony before the magistrate, a second investigator testified that Shook, who was under surveillance, left his residence in Mountain Home following the telephone conversation with Williams and went to a mobile home at space no. 153 in a nearby trailer court. Shook and another man left that mobile home soon thereafter and drove to the meeting with Williams, apparently without stopping along the way. After the cocaine and the money exchanged hands, the participants parted company. Shook and his companion were stopped and arrested minutes later while returning to Mountain Home.

Based upon the testimony of Williams and the second investigator, the magistrate issued a warrant for the nighttime search of the mobile home at space no. 153. At nine o'clock that evening, several law enforcement officers approached the mobile home to execute the warrant. When Crabb appeared at the door, he was ordered down the steps to the ground. He was then told to lie face-down in the snow while the officers conducted a weapons search and placed him under arrest, after which Crabb was taken into the mobile home. There the officers found a small amount of marijuana in plain view on a coffee table. The mobile home and Crabb himself were then searched. Small amounts of cocaine, methamphetamine and marijuana were found on Crabb's person and methaqualone was found in his jacket in the bedroom. In each case, motions to suppress the fruits of this search were filed, but denied.

I

Crabb first argues that there was no probable cause for the issuance of the search warrant. This issue is common to both appeals. He asserts that, while there may have been probable cause to search the *source's* home, there had been no showing that the particular mobile home in question either belonged to or was the residence of the source. Thus, he argues, there was no probable cause to believe contraband was on the premises. The magistrate recognized that neither the owner nor the resident of the mobile home was known, but he still issued the warrant. In fact, the mobile home was Crabb's residence. Crabb contends that Shook's "source" was merely using his washer and dryer to do laundry that night. Indeed, during a suppression hearing, the source himself so testified. The state, however, maintains that the information obtained from Shook, coupled with the permissible

inferences which could have been drawn by the magistrate, established the necessary probable cause for issuance of a search warrant for that particular mobile home, regardless of who actually resided there.

■■■ To determine whether probable cause exists, a magistrate must now employ the "totality of the circumstances" standard. *State v. Lang*, 105 Idaho 683, 672 P.2d 561 (1983). Under this standard,

> [t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). We, in turn, will evaluate the affidavit to determine whether the magistrate had a substantial basis for concluding that probable cause existed. *Id.; State v. Fowler*, 106 Idaho 3, 674 P.2d 432 (Ct.App.1983). The United States Supreme Court has also said

> that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause ...; that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial ...; that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense ...; and that their determination of probable cause should be paid great deference by reviewing courts ....

*Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969) (citations omitted).

■■■ The veracity of Shook, who supplied the hearsay information for the affidavit, was buttressed by the fact that on previous occasions Williams had purchased narcotics from him. In addition, the officers were able to verify, to some degree,

the information obtained from Shook. *See Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). In giving his oral affidavit, Williams was asked by the prosecuting attorney: "Okay, now it is my understanding, though, your telephone conversation earlier with Mr. Shook that he was not going to be actually purchasing the substance but he had to obtain it from a source, or what was the conversation pertaining [sic]." He answered: "Correct, he advised me that he would have to go to a source of supply and that he would bring his source of supply along with him ... to help complete the transaction." Shook then went *directly* to what turned out to be Crabb's mobile home and picked up a man. The two men then proceeded to the place where Shook met with Williams and sold him cocaine. A magistrate is permitted to draw reasonable inferences from the affidavit in determining whether probable cause exists. *People v. Cruz*, 41 Colo.App. 135, 584 P.2d 100 (1978); *State v. Decano*, 60 Haw. 205, 588 P.2d 909 (1978); *State v. Eichhorn*, 47 Ohio App.2d 227, 353 N.E.2d 861 (1975). We believe the magistrate was justified in drawing the inference from these facts that the man Shook picked up was his source. Therefore, given all of the circumstances set forth in the affidavit, the magistrate had a substantial basis to conclude that the mobile home to be searched was the place where the source had some additional cocaine "grammed up."

■■■ Crabb, however, insists that the police had the duty to ascertain whether the source actually resided at the mobile home to be searched. We disagree. "Probability, not proof, is the standard for probable cause." *Kristich v. State*, 550 P.2d 796, 803 (Alaska 1976). *See also Spinelli v. United States, supra.* We thus need not decide whether it was *proved* that contraband was at the mobile home in question. Instead, "[p]robable cause for the issuance of a search warrant exists where the facts and circumstances presented to the magistrate ... are sufficient to warrant a man of reasonable caution in the belief that seizable items are located on the

premises sought to be searched." *State v. Maddasion,* 24 Ariz.App. 492, 539 P.2d 966, 969 (1975). While the police certainly *could* have done more to ascertain the facts, they were not *required* to do so under the circumstances of this case.

■■■ Crabb next argues that the oral affidavit contained double hearsay, referring to information given Shook by his source and then passed on to Investigator Williams. According to Crabb, this renders the affidavit insufficient since neither the "veracity" nor the "basis of knowledge" of the source was included in the affidavit. He cites *State v. Oropeza,* 97 Idaho 387, 545 P.2d 475 (1976). *Oropeza* stands for the proposition that each level of hearsay in an affidavit for probable cause must meet the requirements of "veracity" and "basis of knowledge," under *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States, supra,* in order for the affidavit to be deemed reliable. This two-pronged analysis, however, is no longer a rigid requirement. *Illinois v. Gates, supra.* Thus, while these two prongs are factors to be considered, the affidavit must be considered as a whole in determining whether the magistrate had a substantial basis for finding probable cause. We hold that the oral affidavits in this case met the required tests and were sufficient to establish probable cause for issuance of a search warrant of the mobile home at space no. 153.

Crabb further argues that, even if the search warrant was valid, the search of his person was illegal and the evidence found on him should have been suppressed. The state, on the other hand, claims that the search was incident to a valid arrest. As explained more fully below, there were actually two arrests. The first occurred before the police entered the mobile home. At that time Crabb was told he was being arrested for "frequenting," in reference to I.C. § 37–2732(d). This statute makes it a misdemeanor for a person to "frequent places where he knows illegal controlled substances are being held for distribution,

transportation, delivery, administration, use, or to be given away."

■■■ "A peace officer may ... without a warrant, arrest a person: 1. For a public offense committed or attempted in his presence." I.C. § 19–603. Therefore, the question is whether Crabb violated I.C. § 37–2732(d) in the presence of the arresting officer. We cannot conclude that he did. The statute requires that a person "frequent a place where he *knows* illegal controlled substances are being held for distribution," etc. (Emphasis added.) The statute precludes the interpretation that a person violates the statute simply by his presence at a place where controlled substances are sold. *Cf. United States v. Di Re,* 332 U.S. 581, 587, 68 S.Ct. 222, 225, 92 L.Ed. 210 (1948) ("a person, by mere presence in a suspected car, [does not lose] immunities from search of his person to which he would otherwise be entitled.").

■■■ The officers in the present case arrested Crabb the moment he appeared at the door of the mobile home. They did not then have reason to suspect that Crabb *knew* that illegal controlled substances were being held at that place. Thus, Crabb was arrested for his mere presence at a place suspected of containing controlled substances. While the officers may have had the right to detain Crabb for investigation during the ensuing search of the premises pursuant to a valid warrant, they had no right to arrest him or search his person *at that time.* Therefore, the search of Crabb's person cannot be upheld as a search incident to the first arrest.

However, the search of Crabb's person did not occur immediately following the first, illegal arrest. Rather, Crabb was taken inside the mobile home, at which point the officers saw some marijuana in plain view. It will be recalled that the officers had a warrant to search the mobile home. Consequently, they were where they were entitled to be when the marijuana was observed in plain view. *See Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The record of the misdemeanor trial on the

charge of possession of marijuana makes it clear that the search of defendant's person for controlled substances occurred only after (1) the officers had seen the marijuana in plain view in Crabb's mobile home, (2) the officers knew it was Crabb's mobile home and (3) Crabb had been arrested for possession of the observed marijuana. In the felony cases, Officer Williams testified at two preliminary hearings and at trial. He told of giving Miranda warnings to Crabb, of being told by Crabb that the mobile home was Crabb's residence and of arresting Crabb for possession of marijuana found in plain view.

■■■ It is not clear from the record available to the judge in the *felony* cases, however, whether the arrest came before or after the search of Crabb's person. In *State v. Post*, 98 Idaho 834, 837, 573 P.2d 153, 156 (1978), *disapproved in part on other grounds, State v. Bottelson*, 102 Idaho 90, 625 P.2d 1093 (1981), our Supreme Court stated:

It is well established that a warrantless search of a suspect's person incident to and following a lawful arrest is not an unreasonable search violative of the Constitution. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *State v. Loyd*, 92 Idaho 20, 435 P.2d 797 (1967); *State v. Conner*, 59 Idaho 695, 89 P.2d 197 (1939). However, the logic of this exception to the warrant requirement requires that the search follow, not precede, the arrest. *Johnson v. United States*, [333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948)]. ... Thus, even assuming that prior to the search of the defendant there was probable cause for an arrest, the defendant was not in fact arrested prior to the search. There being no arrest, there could be no search incident to a lawful arrest.

The requirement then that an arrest must *precede* a search was based upon the federal constitution and a United States Supreme Court decision. Following *Post*, the United States Supreme Court handed down *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). There, the Court stated:

Once petitioner admitted ownership of the sizable quantity of drugs found in Cox's purse, the police clearly had probable cause to place petitioner under arrest. Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa.

*Id.* 448 U.S. at 111, 100 S.Ct. at 2564. Since *Post* was based upon an earlier Supreme Court ruling, we believe that a later Supreme Court ruling can effectuate a change in our approach. So long as the search and arrest are substantially contemporaneous, and the fruits of the search are not required to establish probable cause for the arrest, the search need not precisely follow the arrest in Idaho to be incident to that arrest. Probable cause for arrest, of course, is a predicate for either a search or arrest.

■■■ Crabb testified very specifically that he was searched just before he was transported to jail. Williams testified that one of the first things he learned upon entering the mobile home was that Crabb resided there. Logically, then, the discovery of the cocaine, methamphetamine and drug paraphernalia on Crabb's person occurred only after the officers had probable cause to arrest Crabb for possession of marijuana. Furthermore, the search and the arrest occurred within a very short time of one another. Therefore, although the search of Crabb's person *may* have occurred prior to his technical arrest, we hold this search was substantially contemporaneous with, and thus incident to, a lawful arrest. As to the search of Crabb's jacket, which was found in the bedroom and which contained methaqualone, that search was within the scope of the search authorized by the warrant. We conclude that the courts below properly denied Crabb's motions to suppress.

## II

The second issue raised by Crabb—concerning only the felony trial—is whether certain testimony of the state's expert witness should have been excluded. The state called a "criminalist" with the state's forensic laboratory as a witness for the purpose of identifying the substances found on Crabb's person and in his jacket. Crabb objected to any conclusions the witness might draw from the infrared spectroscopy tests he performed on the substances seized. This test measures the wave length at which various substances absorb infrared light. The witness testified that the manner in which different organic compounds absorb infrared light is determined by the molecular structure of the material being tested. Thus, "infrared spectroscopy is very characteristic, very specific for each particular compound." The testing equipment produces the results of the test in the form of continuous line charts, plotted on graph paper, revealing a distinctive pattern of "peaks and valleys" for each compound. By comparing the chart of the unknown substance with "standard" charts of various compounds, identification can be made. Based upon these and other tests the witness conducted, he was permitted to state his opinion to the jury as to the identity of each of the seized substances.

Crabb argues that the standard charts used by the witness in the identification process were unreliable hearsay. Only one of the standards was prepared by the witness himself. Three of the standards were prepared by persons from the state's forensic laboratory who were known by the witness. The methodology used by these persons in the preparation of the standards, however, was unclear from the charts. The last two standards were prepared by the federal Drug Enforcement Administration (DEA) and published in a manual. The district court allowed the witness to testify as to his conclusions based upon these standards. All of the standards—in graph form—utilized by the witness in arriving at his opinion were produced by the state at trial and marked as exhibits. This is true also of the graphs developed when the state's witness ran his tests on the seized substances. Although the witness was questioned, both on direct and on cross-examination, about all of these exhibits, they were not offered into evidence.

However, I.C. § 9–402 establishes an exception to admission of hearsay evidence which covers the present situation. That statute provides in part: "Historical works, books of science or art, and published maps or charts, when made by persons indifferent between the parties, are prima facie evidence of facts of general notoriety and interest." As noted by Crabb himself, this statute has been given a broad interpretation. In *McKay Construction Co. v. Ada County Board of County Commissioners*, 96 Idaho 881, 538 P.2d 1185 (1975), our Supreme Court stated that "[w]hile the statute may not appear to be of direct application herein, it has already been given broad interpretation in Idaho .... The major justifications for creating or enlarging an exception to the hearsay rule have been said to be necessity and reliability." *Id.* at 884, 538 P.2d at 1188. In *McKay*, the court held that both justifications necessary to expand the scope of I.C. § 9–402 existed: "necessity is satisfied since it would be difficult if indeed not impossible to require the persons involved ... to testify in Idaho and the reliability test is also satisfied since the treatises were the results of studies by persons indifferent as between the parties here." *Id.* at 884–85, 538 P.2d at 1188–89. We believe that both justifications were also present in this case.

We note first that the standard for cocaine was prepared by the state's expert witness himself and therefore I.C. § 9–402 need not be applied to justify admission of this particular testimony. "If an expert witness has firsthand knowledge of material facts, he may describe what he has seen, and give his expert inferences therefrom ...." E. CLEARY, McCORMICK ON EVIDENCE § 14 (3d ed.1984). *See also State v. Stringer*, 291 Or. 527, 633 P.2d 770 (1981), *rev'd. on other grounds*, 292 Or. 388, 639 P.2d 1264 (1982). Because the

**306**

expert here prepared both the standard for cocaine and conducted the test on the unknown substance, he had firsthand knowledge and could describe what he had seen and "give his expert inferences therefrom." We hold that the conclusion of the expert witness, that one of the substances seized from Crabb was cocaine, was properly admitted.

The standards for methaqualone and methamphetamine were prepared by persons other than the witness. We need only discuss the standards prepared by the DEA for each substance because we find that they come within the hearsay exception outlined in *McKay*. By themselves, they were sufficient for the witness to identify the unknown substances.[1] The justification of necessity is identical to that recognized in *McKay* and thus is sufficient for our purposes. The justification of reliability, however, is a more difficult proposition. Although prepared by "persons indifferent as between the parties," there is still some question as to the reliability of the DEA standards.

▪ The state's expert witness testified that he found the DEA manual "to be very reliable. I've used quite a few out of that manual to make comparisons." He was then asked: "Then is it accepted within your discipline as a source of reference?" He answered in the affirmative. *Cf. Heilman v. Snyder*, 520 S.W.2d 321, 323 (Ky. Ct.App.1975) ("publication by experts should be admitted in evidence to prove the truth of a matter stated therein if ... a witness expert in the subject testifies ... that the treatise, periodical, or pamphlet is a reliable authority on the subject."). Indeed, in *People v. Dezimm*, 112 Misc.2d 753, 447 N.Y.S.2d 585 (N.Y.Cty.Ct.1981), a New York court found that the DEA standards for cocaine and methaqualone were reliable. Evidence had been introduced that the DEA manual was "respected literature in the field" used by "many, many forensic laboratories," as was testified to in

this case, and that certified samples used in the DEA tests had been tested by someone else. The resulting charts compared favorably to the DEA charts. These facts provided "the basis for an inference that the DEA manual was a reliable standard of comparison." *Id.* at 590. *But compare People v. Miller*, 57 App.Div.2d 668, 393 N.Y.S.2d 679, 681 (1977) (DEA manual not considered reliable absent testimony as to scope of acceptance in profession or independent verification of those standards). Not only did the state's expert testify that the DEA manual was accepted throughout his profession, the charts themselves clearly identified the substances used to create the standards. In the present case the state's witness compared certain of the DEA charts with charts made in the state laboratory. As noted, all of these charts were available at trial and the state's witness could have been examined about any perceived deviations in the charts. We are satisfied that in this case the state laid a sufficient foundation of reliability of the DEA charts to permit the admission of the expert's opinion based upon them. While the charts themselves could have been admitted in evidence it is immaterial in this instance that they were not.

▪ Finally, Crabb argues that the standards in the DEA manual are not "evidence of facts of *general notoriety and interest*," within the meaning of I.C. § 9–402, apparently equating this with general notoriety and interest among the public. He places too narrow an interpretation on the statute. A large number of scientific works are admitted under this rule, particularly in the medical field, which would hardly fall in the category of "general *public* notoriety and interest." *See, e.g., Julien v. Barker*, 75 Idaho 413, 272 P.2d 718 (1954). We believe it is unreasonable to require a scientific work to concern facts known by or of interest to the general public before it is admissible; rather it need be known or of interest only to the

1. We note, however, that there were no significant differences between the DEA standards and the other standards produced at trial.

particular field of endeavor in which it is used. We thus conclude that the district court did not err in admitting this testimony. *See Heilman v. Snyder, supra.*

### III

Crabb's final issue on appeal pertains to the sufficiency of the evidence to sustain the jury's verdicts in the felony trial. Specifically, he contends that the state failed to prove one of the elements of each offense—that the defendant did not possess a valid prescription—and therefore his motion to acquit following the jury verdicts should have been granted. We note initially that I.C. § 37–2745 places the burden of proving the existence of a valid prescription on the *defendant.* Crabb challenged the constitutionality of this statute at trial, alleging that it violated due process by shifting the burden of proof of an essential element of the crime to the defendant. The district court, although not explicitly ruling on this question, instructed the jury that the state was required to prove that the defendant possessed a controlled substance *without a valid prescription.* The state objected to this instruction at trial but has not raised the issue on appeal. Rather, the state maintains that there was sufficient circumstantial evidence from which the jury could have found, beyond a reasonable doubt, that the state proved Crabb did not possess a valid prescription. We therefore need not discuss the constitutionality of the statute.

"On appeal, our review of the sufficiency of the evidence is limited in scope. A judgment of conviction, entered upon a jury verdict, will not be set aside where there is substantial evidence to support it." *State v. Fenley,* 103 Idaho 199, 203, 646 P.2d 441, 445 (Ct.App.1982). It is the province of the jury to determine the credibility of the witnesses and to weigh the evidence. A jury may also draw all justifiable inferences from the evidence. *Id.* In addition, when a defendant appeals from a conviction, we view the evidence most favorably to the prosecution. *Id.*

The evidence from which the jury could draw the inference that Crabb did *not* possess a valid prescription includes the following. First, the controlled substances were not in prescription packaging, but instead were in baggies and a leather pouch. There was testimony by one of the officers that such containers are commonly employed by illicit drug users. Second, on cross examination, the pharmacist called by Crabb testified that methamphetamines are not usually dispensed in the form of a powder—the form it was in when possessed by Crabb. Third, the pharmacist also testified that cocaine is not normally prescribed by itself, although it was so found on Crabb's person. Fourth, drug paraphernalia also was seized from Crabb, *i.e.,* a leather pouch containing a mirror, a razor blade and equipment for nasally ingesting substances. Some of the controlled substances taken from Crabb were found in this same leather pouch. Finally, although Crabb called a pharmacist to testify that the controlled substances were available by prescription, neither that witness nor any other pharmacist or doctor testified that the substances seized had indeed been prescribed.

We hold this evidence was sufficient to allow the jury to justifiably infer that Crabb did not possess the controlled substances pursuant to valid prescriptions. The jury could thus have found all the essential elements of the crime had been proved beyond a reasonable doubt. The district court therefore did not err in denying Crabb's motion to acquit. Accordingly, we affirm the convictions.

WALTERS, C.J., and BURNETT, J., concur.